**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| OAK KNOLL SCHOOL OF THE HOLY CHILD,<br><br>*Plaintiff,*<br><br>v.<br><br>UTICA NATIONAL INSURANCE GROUP,<br><br>*Defendant.* | No. 25-cv-13186 (MEF)(SDA)<br><br>**OPINION and ORDER** |

\*   \*   \*

For the purposes of this Opinion and Order, the Court largely assumes familiarity with the procedural history and allegations of this case.

\*   \*   \*

The case in a nutshell:

A school[1] found broken glass embedded in a grass field it owned. See Complaint for Declaratory Judgment ("Complaint") (ECF 1-2) ¶¶ 1, 12, 13.  So the school filed a claim with its insurance company.[2]  See id. ¶ 12.

The school cited the following provision of the governing insurance policy: "We [the insurance company] will pay your

---

[1]  Oak Knoll School of The Holy Child.

[2]  The complaint calls the relevant insurance company the "Utica National Insurance Group."  In response, the insurance company says that it was "incorrectly identified," Notice of Motion to Dismiss Pursuant to Fed. R. Civ. Pro. 12(b)(6) (ECF 4), and that "Republic Franklin Insurance Group" should have been named as the defendant instead.  Id.  This can be resolved later, as the litigation progresses.

expense to extract 'pollutants' from [school] land." Id. ¶ 9; accord Exhibits A-F (ECF 4-3) at 77. And per the policy, "[p]ollutants" are defined as "any solid . . . irritant or contaminant, including . . . waste." Complaint ¶ 10; accord Exhibits A-F at 88.

Coverage was denied, see id. ¶¶ 14, 18, 20, and the school sued the insurance company. See id. at 1.[3]

From here, the school is called "the Plaintiff" and the insurance company is called "the Defendant."

The Defendant moves to dismiss under Federal Rule of Civil Procedure 12(b)(6). See Notice of Motion to Dismiss Pursuant to Fed. R. Civ. Pro. 12(b)(6) (ECF 4).

The motion is denied.

*      *      *

The question here is whether glass removal is covered by the above-quoted policy provision.

Yes, says the Plaintiff --- and therefore the Defendant's motion to dismiss should be denied. Broken glass, the argument goes, is "a solid material . . . [that] irritates and contaminates the surface of the insured property" and "constitutes waste that must be removed and discarded." Plaintiff's Opposition to Defendant's Motion to Dismiss ("Plaintiff's Opposition") (ECF 5) at 4.

Glass does not count, argues the Defendant, and therefore its motion should be granted. "There is no connection, real or alleged, between the glass and an environmental hazard, incident, or catastrophe," and under a New Jersey Supreme Court decision,[4] the Defendant contends, that sort of connection is required for a claim under the pollution clause the Plaintiff invokes. Memorandum of Law in Support of Defendant, Republic of Franklin Insurance Group Incorrectly Identified as Utica National Insurance Group's Motion to Dismiss Pursuant to Fed. R. Civ. Pro. 12(b)(6) ("Defendant's Brief") (ECF 4-2) at 11–14.

*      *      *

---

[3]  The lawsuit started off in a New Jersey state court, but was removed here. See Notice of Removal (ECF 1).

[4]  More on the case later.

2

The parties' briefs assume that New Jersey law governs their dispute.  See Defendant's Brief at 9; Plaintiff's Opposition at 3-6.  So it does.  See Wiggins v. Netflix, Inc., 2026 WL 114377, at *1 n.4 (D.N.J. Jan. 14, 2026).[5]

"[T]he decisions of the New Jersey Supreme Court are the authoritative source" of New Jersey law.  Navigators Specialty Ins. Co. v. Citizens Ins. Co. of Am., 739 F. Supp. 3d 259, 265 (D.N.J. 2024) (cleaned up); accord, e.g., Smith v. CitiMortgage, Inc., 702 F. Supp. 3d 247, 256 (D.N.J. 2023); Pim Brands, Inc. v. New Cibo Vita LLC, 2025 WL 2938602, at *1 (D.N.J. Oct. 16, 2025).

But there is no "controlling," Popa v. Harriet Carter Gifts, Inc., 52 F.4th 121, 125 (3d Cir. 2022), New Jersey Supreme Court decision as to the question on the table --- namely, whether broken glass counts as a "pollutant" for an insurance policy worded roughly like this one.

Therefore, the Court "must 'predict' how the Supreme Court of New Jersey will eventually resolve this issue."  Navigators, 739 F. Supp. 3d at 265 (cleaned up).

In doing so, the Court can look to "a range of sources." Schulman v. Zoetis, 684 F. Supp. 3d 275, 278 (D.N.J. 2023).

*    *    *

The Court first considers lower-court decisions that construe New Jersey law --- state court decisions, see Pim Brands, 2025 WL 2938602, at *5, and federal court ones.  See Navigators, 739 F. Supp. 3d at 267; Badalamenti v. Resideo Techs., Inc., 2025 WL 3013023, at *7 (D.N.J. Oct. 28, 2025).

But the parties point to no cases in which a court has issued a ruling on whether, under New Jersey law, broken glass is covered under pollution provisions like the one here.

---

[5]  There may be outer limits to the idea that the parties' assumed choice of law can fix choice of law in place.  See Chapman v. Salesforce, Inc., 2026 WL 74192, at *1 n.4 (D.N.J. Jan. 9, 2026).  But even if there are such limits, they are not exceeded here.  New Jersey law is invoked and there is a real connection to New Jersey --- the Plaintiff-school is located here.  See Complaint ¶ 1.

The Court's search has not turned up any on-point New Jersey law cases, either.

\*    \*    \*

Second, the Court looks to how other bodies of law treat the legal issue in play.

A look to the law from other parts of the Nation is useful as a general matter for predicting how the New Jersey Supreme Court would resolve an open question of New Jersey law. See Tryp Hotels Worldwide, Inc. v. Sebastian Hotel, LLC, 726 F. Supp. 3d 373, 388 (D.N.J. 2024); Howard v. Wells Fargo Bank, N.A., 733 F. Supp. 3d 352, 357 (D.N.J. 2024), aff'd, 2024 WL 4890984 (3d Cir. Nov. 26, 2024).

And it is especially useful in predicting how the New Jersey Supreme Court would resolve an open question of New Jersey insurance-coverage law. See generally Navigators, 739 F. Supp. 3d at 268-69; Badalamenti v. Resideo Techs., Inc., 755 F. Supp. 3d 534, 542 n.11 (D.N.J. 2024).

After all, the New Jersey Supreme Court routinely looks to the law of other states to work through insurance-coverage questions, particularly when they relate to standard-form insurance contracts, like the one here. See, e.g., Cypress Point Condo. Ass'n, Inc. v. Adria Towers, L.L.C., 226 N.J. 403, 421-24 (2016) (looking to a Supreme Court of Florida decision); Morton Int'l, Inc. v. Gen. Accident Ins. Co. of Am., 134 N.J. 1, 23-27 (1993) (to "numerous federal and state court[]" decisions); Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231, 242-44 (2008) (to "consensus among our sister jurisdictions").

And "[t]o accurately predict how a state supreme court will rule on an open legal question, a federal court should generally analyze the question using the same interpretative approach" --- here, looking to other states' laws --- "that the state supreme court applies in the relevant area of the law." Navigators, 739 F. Supp. 3d at 268.[6]

---

[6]  Why does the New Jersey Supreme Court look to the law of other states to guide the development of New Jersey insurance-coverage law?  Consider one possible answer here.  An upside to having standardized contracts available, ones that can simply be pulled down off the rack and used, is lower transaction costs.  If a

fresh contract does not need writing from scratch every time someone wants to, say, rent a car --- that means that less money and time need to be spent on negotiating and drafting. (This is, in part, why "form books" have long been relied on, see John F. Coyle, A Short History of the Choice-of-Law Clause, 91 U. Colo. L. Rev. 1147, 1170-74 (2020), and why people look to materials produced by entities like Nolo.) Insurance contracts are no exception to any of this. Standardizing insurance contracts also lowers transaction costs. See, e.g., Stephen J. Ware, Comment, A Critique of the Reasonable Expectations Doctrine, 56 U. Chi. L. Rev. 1461, 1477-78 (1989); Jeffrey W. Stempel, Reassessing the "Sophisticated" Policyholder Defense in Insurance Coverage Litigation, 42 Drake L. Rev. 807, 830 (1993). But what standardized insurance-contract language gives on the front-end, judicial interpretation can take away on the back-end. As noted, contracting parties can reach for the standard form if they want to, and save on transaction costs. But if judges then interpret the standard form's terms (like, say, "commercial" or "residence") in a great many disparate ways --- that can fritter away the upfront cost savings. A too-large multiplicity of interpretations can breed uncertainty; uncertainty can facilitate dispute; and dispute costs. Money that did not need paying to transactional lawyers to draft an agreement at time one (because a standard form was used) might be spent anyway --- at time two, on litigators, to argue in court about what "commercial" and "residence" mean. Standardized judicial interpretation of key contractual terms can help to ensure that transaction costs that were saved stay saved --- and do not just reemerge in another form later, as litigation costs. All of this is part of why judges are required to follow precedent in the contract-law context, to generate interpretations of key contractual terms that converge (standardize) over time. And all of this may well be why, in insurance-coverage cases, the law of one state is generally guided, in part, by the law of other states. After all, the "insurance business is mainly conducted across state lines." Robert L. Stern, The Commerce Clause and the National Economy, 1933-1946 Part Two, 59 Harv. L. Rev. 883, 909 (1946). So if courts are aiming to reduce overall uncertainty as to what "commercial" or "residence" mean, it may make sense to try to iron out some of the differences between one body of law and others. And that can be accomplished, in part, by allowing the development of this body of law to be influenced by the content of those bodies of law. That seems to be New Jersey's approach, as set out in the text. And it is the approach of other states, too. See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI

But this is a dead end.

The parties have not identified any decisions from other jurisdictions that address whether broken glass is included in the term "pollutants."  And the Court had not found any, either.

\*     \*     \*

Third, the Court can look to how the law addresses analogous issues.  See Spence v. ESAB Grp., Inc., 623 F.3d 212, 216 (3d Cir. 2010); Norfolk S. Ry. Co. v. Basell USA Inc., 512 F.3d 86, 92 (3d Cir. 2008); Koppers Co. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1445 (3d Cir. 1996); Howard, 733 F. Supp. 3d at 358 ("Where a legal problem . . . is handled in a certain way in one area of law . . . --- that can suggest it will be handled in a similar way in another, closely-adjacent area of law[.]").

As noted, there do not seem to be any decided cases as to whether glass removal is covered under an insurance policy like the one at issue here.

But what about analogous substances?[7]

Courts have assessed whether an insurance policy worded roughly like the one here relates to the removal of substances that are arguably akin to the broken glass at the school.

What kinds of substances are potentially analogous to the broken glass?

Solid substances that, when present in sufficient bulk or volume, alter the pre-existing (and expected) character of a plot of land[8] and markedly limit its ordinary (and expected) use.

In most of the cases involving those sorts of solid substances, courts have held that the substance counts as a "pollutant." See Ortega Rock Quarry v. Golden Eagle Ins. Corp., 141 Cal. App. 4th 969, 979–80, 990 (2006) (dirt and rocks); Pa. Nat. Mut. Cas.

---

Indus., Inc., 907 S.W.2d 517, 522 (Tex. 1995) ("Courts usually strive for uniformity in construing insurance provisions, especially where, as here, the contract provisions at issue are identical across the jurisdictions.").

[7]  No cases involving arguably analogous substances are cited by the parties.  The cases that follow in the text have not been brought to the Court's attention by them.

[8]  Or water.

6

Ins. Co. v. Triangle Paving, Inc., 973 F. Supp. 560, 562, 567 (E.D.N.C. 1996) (sedimentation); Monarch Greenback, LLC v. Monticello Ins. Co., 118 F. Supp. 2d 1068, 1070 n.1, 1079–80 (D. Idaho 1999) (by-products of gold mining comprised of sand, silt, clay, and traces of various metals); James River Ins. Co. v. Ground Down Eng'g, Inc., 540 F.3d 1270, 1277 (11th Cir. 2008) (construction debris); Am. Contracting & Mgmt. Corp. v. Liberty Mut. Ins. Co., 1995 WL 854725, at *1–2 (Mich. Ct. App. June 13, 1995) (tree stumps, fencing, wood, metal construction materials, and other debris); E. Concrete Materials, Inc. v. ACE Am. Ins. Co., 948 F.3d 289, 294, 301–02 (5th Cir. 2020) (very small stone fragments); Essex Ins. Co. v. H & H Land Dev. Corp., 525 F. Supp. 2d 1344, 1352–53 (M.D. Ga. 2007) (sediment deposits); Atl. Cas. Ins. Co. v. Ramirez, 651 F. Supp. 2d 686, 691 (N.D. Tex. 2009) (foundry refuse, brush, trees, wood grindings, and construction and demolition debris); Great Am. Ins. Co. v. R.J. Schinner Co. Inc., 704 F. Supp. 3d 881, 886–87 (E.D. Wis. 2023) (paper and plastic products); Aetna Cas. & Sur. Co. v. Dow Chem Co., 933 F. Supp. 675, 682–84 (E.D. Mich. 1996) (styrofoam, polystyrene, rubble, and debris); New Salida Ditch Co. v. United Fire & Cas. Ins. Co., 2009 WL 5126498, at *1 n.1, *9 (D. Colo. Dec. 18, 2009) (soil, sand, dirt, rocks, and sediment), aff'd, 400 F. App'x 338 (10th Cir. 2010); Emps. Mut. Cas. Co. v. Tiger Creek Dev., Inc., 2022 WL 2318503, at *1 (M.D. Ga. June 28, 2022) (sediment runoff); Judd Ranch, Inc. v. Glaser Trucking Serv., 2007 WL 1520905, at *2, *7 (D. Kan. May 22, 2007) (aluminum scrap metal).

But not in all of the cases.

In some cases, courts have landed on the opposite conclusion --- that such solid substances do not amount to a "pollutant." See W. Bend Mut. Ins. Co. v. Iowa Iron Works, Inc., 503 N.W.2d 596, 598, 600 (Iowa 1993) (spent foundry sand); Manus v. Ranger Ins. Co., 142 F. App'x 280, 282 (9th Cir. 2005) (dirt, brush, weeds, grapevines, leaves, tree stumps, tree branches, ice plants, sod, concrete, and tires); Ruffin Rd. Venture Lot IV v. Travelers Prop. Cas. Co. of Am., 2011 WL 2463291, at *4, *7 (S.D. Cal. June 20, 2011) (mud and rocks); Tsakopoulous v. Am. Mfrs. Mut. Ins. Co., 2003 WL 22595248, at *1, *8 (E.D. Cal. Aug. 9, 2000) (soil); Everest Nat'l Ins. Co. v. Megasand Enters., Inc., 2022 WL 6246854, at *1, *4, *6–7 (S.D. Tex. Aug. 5, 2022) (silt, sand, sediment, and construction materials), report and recommendation adopted, 2022 WL 6225838 (S.D. Tex. Oct. 7, 2022); Atain Specialty Ins. Co. v. Triple PG Sand Dev., LLC,

7

2023 WL 2307647, at *4, *6 (S.D. Tex. Feb. 28, 2023) (silt, sand, sediment, and dirt), report and recommendation adopted, 2023 WL 4878902 (S.D. Tex. Mar. 22, 2023); Evanston Ins. Co. v. Tex. Concrete & Sand Gravel, Inc., 2022 WL 18144985, at *4-5 (S.D. Tex. Aug. 2, 2022) (silt, sand, sediment, dirt, and rock), report and recommendation adopted, 2022 WL 18144986 (S.D. Tex. Aug. 30, 2022).

In short, the balance of authority tilts in favor of the conclusion that solid substances of the sort described above[9] count as pollutants.

This supports the conclusion that the New Jersey Supreme Court would hold that broken glass --- which is analogous to the referenced solid substances --- is covered under the pollutant-cleanup clause here.[10]

But too much should not be made of this.

As between (i) broken glass and (ii) the solid substances in the above-cited cases --- the analogy may not be perfectly airtight.[11]

And moreover, the cases do not reflect an overwhelming consensus one way or another.  The split between solid-substances-are-pollutants cases and solid-substances-are-not-pollutants cases veers close to even.  So the cases do not collectively throw off a singular, clear signal as to how the New Jersey Supreme Court might proceed.  See Badalamenti, 2025 WL 3013023, at *6 (holding that relevant caselaw did not provide a "strong" basis for predicting how the New Jersey Supreme Court would rule because the cases were "close to being evenly split") (cleaned up); Navigators, 739 F. Supp. 3d at 266 (same).

*       *       *

---

[9]  That is, solid substances that, when present in sufficient bulk or volume, alter the pre-existing (and expected) character of a plot of land and markedly limit its ordinary (and expected) use.

[10]  The cited cases involve pollution exclusion clauses, with one exception.  See Ruffin Rd. Venture Lot IV, 2011 WL 2463291, at *4-7.  Nonetheless, they are useful data points.

[11]  And the parties have not weighed in on it.  See footnote 7.

Fourth and finally, to predict how the New Jersey Supreme Court would resolve the open question here, as to broken glass, the Court considers "general legal principles as articulated by the New Jersey Supreme Court." Tryp Hotels, 726 F. Supp. 3d at 389; see also Schulman, 684 F. Supp. 3d at 279–81.

One such "general legal principle[]," Tryp, 726 F. Supp. 3d at 389, is this: clauses in insurance contracts that "extend coverage are to be viewed broadly and liberally." Villa v. Short, 195 N.J. 15, 24 (2008) (cleaned up); see also Mazzilli v. Accident & Cas. Ins. Co. of Winterthur, Switz., 35 N.J. 1, 8 (1961).

And the relevant term here, "pollutants," appears in a clause, Complaint ¶ 9, that "extend[s] coverage." Villa, 195 N.J. at 24. This favors a broader reading --- one that would include an obligation on the part of the insurance company to pay for the glass removal.

Another relevant general principle: "an insurance policy should be interpreted according to its plain and ordinary meaning." Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175 (1992).

Here, the question is whether the insurance policy's coverage of "pollutants" reaches the broken glass.

The policy defines "pollutants" to include, among other things, "any solid . . . contaminant." Complaint ¶ 10; Exhibits A-F at 88.

But "contaminant" is not further defined in the policy. How then to get at its "plain and ordinary meaning"? Voorhees, 128 N.J. at 175.

"To discern 'the plain, ordinary meaning' of insurance contract terms, New Jersey courts routinely look to dictionary definitions." G.E.M.S. Partners LLC v. AmGUARD Ins. Co., 742 F. Supp. 3d 410, 414 n.3 (D.N.J. 2024) (collecting cases).

And going that route favors the conclusion that glass removal is covered.

An everyday dictionary, Merriam-Webster, defines "contaminant" as "something that contaminates." Contaminant, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/contaminant (last visited Feb. 17, 2026). And then it defines "contaminates" as "to make unfit for use by the introduction of unwholesome or undesirable elements."

Contaminates, Merriam-Webster Dictionary, https://www.merriamwebster.com/dictionary/contaminates (last visited Feb. 17, 2026).

The broken glass was an "undesirable element[]," id., in the grass sports field where it was discovered.  See Complaint ¶¶ 1, 12-13.  And its "introduction," Contaminates, Merriam-Webster Dictionary, allegedly made the field "unfit for use," id.  See Complaint ¶ 13.

*    *    *

Where things stand.

The Defendant-insurance company seeks to dismiss the Plaintiff-school's case --- because, per the Defendant, it cannot be liable under the governing insurance policy for removing the broken glass at issue here.

In making its argument, the Defendant bears the burden.  See, e.g., Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).

But it cannot carry that burden without reckoning with the arguably analogous caselaw here, see footnote 7 --- which, as noted, favors the Plaintiff (though only to a limited extent).  Cf. Volynsky v. Prudential Ins. Co. of Am., 2025 WL 3062787, at *2 (D.N.J. Nov. 3, 2025).

Moreover, the Defendant cannot carry its burden without taking on more fully the general principles of New Jersey law set out above.  They call for a "broad[] and liberal," Villa, 195 N.J. at 24, read of provisions that extend coverage, and looking to the "plain and ordinary meaning" of key words, Voorhees, 128 N.J. at 175, as reflected in dictionaries.  Applying these principles here moves the needle in the Plaintiff's direction.

Whether all of the above would be enough for the Plaintiff to ultimately get over the finish line, to win here as a matter of law at the end of the case --- that is not the question now before the Court.  Rather, the question is whether the Defendant has carried its motion-to-dismiss burden.  It has not.

*    *    *

Before concluding, take up a counterargument --- the Defendant's contention that it should prevail based on the New Jersey Supreme Court's decision in Nav-Its, Inc. v. Selective Insurance Co. of America, 183 N.J. 110 (2005).

10

Nav-Its concerned an insurance policy exclusion[12]; under the exclusion, the insurer did not have to cover "injuries caused by the 'discharge, dispersal, release or escape of pollutants.'" Id. at 112.  The New Jersey Supreme Court held that the exclusion should be "limited to traditional environmental pollution."  Id. at 126.

The Nav-Its policy and the policy at issue in this case use identical definitions of "pollutants."  Compare Nav-Its, 183 N.J. at 115 (defining "pollutants" to include "any . . . solid irritant or contaminant, including . . . waste"), with Complaint ¶ 10 (same).

From this, the Defendant argues that the "pollutant" provision in the Nav-Its policy and the "pollutant" provision here must be read the same way.  See Defendant's Brief at 12–13.

More specifically, the Defendant contends, the pollutant exclusion in Nav-Its was only triggered in the context of "'traditional environmental pollution.'"  See id. at 13 (quoting Nav-Its, 183 N.J. at 124).  So too, the Defendant argues, the pollutant-removal coverage clause[13] in this case should only come into play when an insured makes a "traditional environmental pollution," Nav-Its, 183 N.J. at 126, claim.

And because "[t]here is no connection, real or alleged, between the glass [at the school] and an environmental hazard, incident, or catastrophe," Defendant's Brief at 14, the Defendant argues, the Plaintiff's claim was properly denied.

But the argument is not persuasive because it rests on a misreading of Nav-Its.  The next section explains why.

\*     \*     \*

As the New Jersey Supreme Court explained in Nav-Its, providers of commercial insurance tried for decades to limit their

_____

[12]  An exclusion limits what the insurer would otherwise be required to cover under the policy.

[13]  A coverage clause determines what the insurer must cover under the policy in the first place --- before an exclusion clause (if any) whittles things back.

11

exposure to environmental-pollution claims.  See Nav-Its, 183 N.J. at 120–23.[14]

To do so, insurance companies tried a number of different tacks --- including developing a new standard-form exclusion.  See Nav-Its, 183 N.J. at 121.

The exclusion's language seemed to sweep very broadly.  See Nav-Its, 183 N.J. at 121–22.  But at key hearings, "[t]he insurance industry presented testimony to the [New Jersey State Insurance Department] regulators as to the intended purposes of the [new standard-form] pollution exclusion."  Id.

> The regulators were concerned that the then-proposed exclusion sought to sweep too many potential non-environmental liabilities within its reach.  The insurance industry sought to allay those fears and, thus, secure the needed approval of this exclusion.

Id. at 122 (quoting Lorelie S. Masters, Absolutely Not Total: State Courts Recognize the Historical Limits of the "Absolute" and "Total" Pollution Exclusions, 15 Env't Claims J. 451, 453 (2003)).

In Nav-Its, the New Jersey Supreme Court essentially held the insurer to the representations that had been made on its behalf, years before, to get the pollution exclusion approved in the first place.  See id. at 123–24.

The pollution exclusion had been pitched to regulators as a solution to a specific and widely-understood problem.  See Jeffrey W. Stempel, Reason and Pollution: Correctly Construing the "Absolute" Exclusion In Context and in Accord with Its Purpose and Party Expectations, 34 Tort & Ins. L.J. 1, 29, 31–32 (1998) (the "pollution exclusion was designed to serve the twin purposes of eliminating coverage for gradual environmental degradation and government-mandated cleanup such as Superfund

---

[14]  Those sorts of claims can be outsized and unpredictable. They posed a threat to the financial health of the insurance industry.  See Jeffrey W. Stempel, Reason and Pollution: Correctly Construing the "Absolute" Exclusion In Context and in Accord with Its Purpose and Party Expectations, 34 Tort & Ins. L.J. 1, 5 (1998) (cited in Nav-Its, 183 N.J. at 122–23); see also Note, Joshua Rosenkrantz, The Pollution Exclusion Through the Looking Glass, 74 Geo. L.J. 1237, 1251 (1986).

response cost reimbursement") (quoted in Nav-Its, 183 N.J. at 122-23).

And per the Nav-Its court, the pollution exclusion would control in that context --- but not beyond.  Regardless of the reach of its language as an abstract matter, the exclusion shielded insurers only from having to make payments related to a particular type of claim --- the type that had been described to regulators as the point of the exclusion.

> Based on [our] review [of the origins of the relevant exclusions], we are confident that the history of the pollution-exclusion clause in its various forms demonstrates that its purpose was to have a broad exclusion for traditional environmentally related damages.

> Notably, we have not been presented with any compelling evidence that the pollution exclusion clause in the present case, when approved by the Department of Insurance, was intended to be read as broadly as [the insurance company] urges.  To be sure, read literally, the exclusion would require its application to all instances of injury or damage to persons or property caused by "any pollutants arising out of the discharge, dispersal, seepage, migration, release or escape of . . . any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."  . . .  We reject [the insurance company's] interpretation as overly broad, unfair, and contrary to the objectively reasonable expectations of the New Jersey and other state regulatory authorities that were presented with an opportunity to disapprove the clause. . . .

> [T]he insurance industry may not seek approval of a clause restricting coverage for the asserted reason of avoiding catastrophic environmental pollution claims and then use that same clause to exclude coverage for claims that a reasonable policyholder would believe were covered by the insurance policy.

Nav-Its, 183 N.J. at 123-24 (citations omitted).

In short, Nav-Its was based on a kind of industry-wide regulatory estoppel.  Having procured regulatory approval based on representations that a standard clause excluded coverage over one, narrow type of claim --- insurance companies could not, a

13

generation later, ignore those same representations and focus just on the stand-alone wording of the clause, in a way that would exclude coverage of a much broader range of claims than just "traditional environmental pollution."[15]

But there is nothing like any of this here.

_____

[15] Other states have taken roughly this same sort of regulatory estoppel approach. See MacKinnon v. Truck Ins. Exch., 31 Cal. 4th 635, 653 (2003) (rejecting broad construction of pollution exclusion in part because the insurer did not produce "evidence that [a] substantial limitation on 'coverage' was communicated to . . . insurance regulators"); Joy Techs., Inc. v. Liberty Mut. Ins. Co., 187 W. Va. 742, 749 (1992) (adopting narrow construction of pollution exclusion because the insurer's representative "unambiguously and officially represented to the West Virginia Insurance Commission that the exclusion in question did not alter coverage"); Claussen v. Aetna Cas. & Sur. Co., 259 Ga. 333, 337 (1989) (adopting narrow construction of pollution exclusion in part because it was "not contrary to the interpretation" the insurer offered to state regulators "when it was adopted"); Just v. Land Reclamation, Ltd., 155 Wis. 2d 737, 746–52 (1990) (construing the phrase "sudden and accidental" in pollution exclusion to align with "[c]ontemporaneous representations by the insurance industry" that were "relied upon by insurance regulators" when they approved the provision at issue); Sunbeam Corp. v. Liberty Mut. Ins. Co., 566 Pa. 494, 500 (2001) ("Thus, having represented to [insurance regulators] . . . that the new language in [a pollution exclusion] . . . did not involve a significant decrease in coverage from the prior language, the insurance industry will not be heard to assert the opposite when claims are made by the insured policyholders."); see also Ala. Plating Co. v. U.S. Fidelity & Guar. Co., 690 So. 2d 331, 336 (Ala. 1996); Textron, Inc. v. Aetna Cas. & Sur. Co., 754 A.2d 742, 752–54 (R.I. 2000). But the regulatory estoppel approach is not the standard one. See Susan Stryker, Regulatory Estoppel, N.J. Law., Aug. 2012, at 53, 55 ("[O]nly a minority of states have followed New Jersey's approach."); 2 Environmental Insurance Litigation: Law and Practice § 18:26 (2025 ed.) (similar); 1 Law and Practice of Insurance Coverage Litigation § 1:16 (2025 ed.) (similar); 9 Couch on Insurance § 127:10 & n.4 (3d ed. 2025) (similar).

Insurance contracts generally mean what they say.  See id. at 118.  That is the bread-and-butter background rule.

But in Nav-Its an exception was carved into this rule, because regulators had essentially been told by the insurance industry that the pollution exclusion would not be read to mean all that it says (because doing so would swallow up a great deal, would exclude a broad range of otherwise-covered claims).

But here, in this case, there is no similar reason to move away from the ordinary background rule, the rule that insurance contracts mean what they say.

No one is said to have made a contrary (and therefore estopping) promise to state regulators.

Insureds, for example, have not somehow sworn to state insurance regulators that they would seek coverage under the pollution coverage clause here only for "traditional environmental pollution" --- and not for what the language of the clause seems to encompass on it face, which includes broken glass.[16]

Nav-Its, in short, is not controlling here.

That is confirmed by a more recent New Jersey Supreme Court case, AC Ocean Walk, LLC v. American Guarantee & Liability Insurance Co., 256 N.J. 294 (2024).

There, a casino filed claims because it had to close during the Covid pandemic.  See id. at 304-05.  The insurers mainly denied coverage --- and later cited, among other things, contamination exclusions in the governing policies.[17]  See id. at 305-06.

Relying mainly on Nav-Its, the trial court read the contamination exclusion as "substantially directed at traditional environmental and industrial damages" and held it "inapplicable" to the casino's claims.  Id. at 306 (cleaned up).

---

[16]  What matters is what insureds might have told regulators.  An insured cannot be estopped from taking a position based on what someone else might have told regulators.

[17]  The policies defined "contamination" as "any condition of the property due to the actual presence of any . . . pollutant."  AC Ocean Walk, 256 N.J. at 303-04 (cleaned up).

15

But the Supreme Court of New Jersey disagreed.  See id. at 319–22.  It concluded "Nav-Its d[id] not govern th[e] appeal" for two reasons.  Id. at 321.

One of the reasons: the casino did not contend "that insurance regulators were [ever] misled . . . about the import of the contamination exclusion."  Id.

So too here.

Nav-Its "does not govern," id., because there is no suggestion in this case that regulators were told that the relevant pollution coverage clause would not be invoked by insureds in cases like this one.  Insureds cannot be estopped from seeking coverage based on what they said to regulators when they did not say anything at all.

*     *     *

The Defendant has not established that the Plaintiff's complaint fails to state a claim.  Therefore, the Defendant's motion to dismiss at ECF 4 is denied.[18]

IT IS on this 19th day of February, 2026, SO ORDERED.

_____
Michael E. Farbiarz, U.S.D.J.

---

[18]  The Defendant also argues that the school's field is not covered based on provisions excluding "[l]and" and "'[t]he cost of excavations, grading, backfilling, or filling'" from the definition of "Covered Property."  See Defendant's Brief at 10–11; Exhibits A-F at 74.  But the policy includes a distinct "affirmative promise to pay for the extraction of pollutants from land."  Plaintiff's Opposition at 3; Exhibits A-F at 77.  That cannot be read out of the insurance contract.  See Prather v. Am. Motorists Ins. Co., 2 N.J. 496, 502 (1949); see also First Baptist Church of Mauriceville v. GuideOne Mut. Ins. Co., 2009 WL 415482, at *5 (E.D. Tex. Feb. 17, 2009) (declining to read "policy's general exclusion of 'land' from 'covered property'" so broadly as to render distinct coverage for pollutant cleanup and removal "meaningless"); Ashraf v. State Auto Prop. & Cas. Ins. Co., 239 W. Va. 119, 127–28 (2017) (similar).

16